## CHARLESTON.

### HINCHMAN v. MORRIS.

Submitted January 22, 1887.—Decided April 2, 1887.

1. SUBROGATION—TAXES—ASSIGNMENT OF.

The levying and collecting of a tax, whether State or county, is a matter solely of statutory creation. Such taxes are not debts; and unless they are expressly or by plain implication authorized to be assigned legally or equitably, they are incapable of assignment; and no one can be subrogated to the rights and remedies of the State. (p. 683.)

2. SUBROGATION—TAXES—ADVANCES BY SHERIFF.

If therefore under the Code of Virginia of 1860 the Sheriff settled in full with the auditor and paid all the State-taxes not returned delinquent, he can not thereafter by distraint or in any other manner make out of any tax-payer not returned delinquent, and whose taxes he has advanced, the amount of the taxes so advanced, as he can not be subrogated to the rights and remedies of the State for said taxes; nor can he in any manner make it out of the estate real or personal of said tax-payer either before or after his death. And when said Sheriff has made said settlement and said payment in full to the auditor without any promise express or implied by said tax-payer to refund the amount so advanced, he can not recover it in any action of assumpsit or any other action; nor can he make the amount of said taxes out of the estate of said tax-payer either as taxes or as a debt due to him. (p. 689.)

3. APPEAL.

Under the statute allowing appeals to this Court no appeal can be allowed, on the ground that the decree complained of *adjudicated the principles of the cause*, unless all questions of controversy in the cause, which have in any manner arisen, were adjudicated by the decree or had been previously settled, before this decree was entered. (p. 699.)

A statement of the case by GREEN, JUDGE:

On September 1, 1877, John S. Wilkinson filed his petition in the cause of *Elizabeth Hinchman, curator &c.* v. *Charles K. Morris, administrator of John Morris, deceased, et al.*, which was a creditors' suit then pending in the Circuit Court of Cabell county brought to subject the assets of John Mor-

ris, deceased, both real and personal, to the payment of his debts. The petition was as follows:

"John S. Wilkinson, your petitioner, represents that he was deputy sheriff of Cabell county in the year 1860, that as such deputy sheriff he paid the tax bill against the estate of said John Morris for said year, and hereto annexed as part of this petition, and said payment was not ratified by said Morris, and that he has never been repaid the same, that he has a right to be substituted to the lien of the State for the taxes on said lands of John Morris, and he prays that his tax claims may be declared prior liens for his benefit and general relief."

The following is the exhibit filed with the petition:

"MORRIS, JOHN, To S. C. C., Dr. ———, 1860:

| | | |
|---|---:|---:|
| Tax on property for Rev. and capitation | $26 | 72 |
| Tax on property for Cty. Levy | 5 | 69 |
| | $32 | 41 |
| Tax on 2,300 Ac. L. Rev. $9.20, C. P. $1.56 | 10 | 76 |
| Tax on 992 Ac. do. Rev. 47.61, C. P. 8.09 | 55 | 70 |
| Tax on 88⅓ Ac. do. Rev. 2.82, C. P. .48 | 3 | 30 |
| Tax on 170 Ac. do. Rev. .68, C. P. .13 | | 81 |
| Tax on 780 Ac. do. Rev. 4.95, C. P. .84 | 5 | 80 |
| Tax on 285 Ac. do. Rev 11.40, C. P. 1.94 | 13 | 34 |
| Tax on 1,450 Ac. do. Rev. 58.00, C. P. 9.86 | 67 | 86 |
| Tax on 400 Ac. do. Rev. 1.60, C. P. .27 | 1 | 87 |
| Tax on 200 Ac. do. Rev. 4.80, C. P. .82 | 5 | 62 |
| Tax on 70 Ac. do. Rev. .56, C. P. .10 | | 66 |
| Tax on 115 2-9 Ac. do. Rev. .46, C. P. .08 | | 54 |
| Tax on 566 Ac. do. Rev. 9.07, C. P. 1.54 | 10 | 61 |
| Tax on 63½ Ac. do. Rev. 2.04, C. P. .35 | 2 | 39 |
| Tax on 69 3-5 Ac. do. Rev. .86, C. P. .15 | 1 | 01 |
| | "$242 | 32" |

It will be observed that there is an error in adding up the items of this tax bill of $29.64, the true amount being $212.68.

On May 18, 1882, John S. Wilkinson was permitted by the court against the objection of Morris, administrator, to amend this petition by setting out at length the character of his claim and stating, that John Morris owning a large amount of property, he having this tax-ticket for 1860 to collect as deputy for W. B. Moore, sheriff of Cabell county,

settled it and paid over the amount, instead of returning it as delinquent, as was his custom in such cases;—that John Morris died shortly afterwards in 1862 without paying the petitioner the amount so paid for his use and without ratifying the payment for him of taxes, the petitioner never having pressed him for its payment. The petitioner claims, that at the time of his death this tax-bill was a valid and subsisting lien upon the real estate of said Morris for the use of the petitioner, and that it never has been paid by the administrator of said Morris; and that this tax-bill by the statute of distributions is a preferred charge on the real and personal estate of said Morris. The petitioner also alleged, that in this cause there were in the hands of the court the proceeds of the sale of said Morris's real estate, a large amount, amply sufficient to pay this claim in due order of administration. This suit was instituted in 1864 as a regular creditors' bill; and this amended petition asks, that his claim be paid out of the assets of Morris now in the hands of the receiver and for general relief. This amended petition was sworn to.

The administrator of John Morris answered this petition; and his answer was replied to generally. In his answer the said administrator denies, that the exhibit filed with the petition and amended petition was a regular tax-ticket, and points out the fact, that the tax-ticket, if it be one, shows on its face, the $32.41, the amount of the first two items, were not for taxes on real estate. He claims, that no part of this tax-ticket was a lien on the real estate of John Morris after the payment of it, as stated in the amended petition. He states further, that in the years 1860, 1861 and 1862 John Morris had an abundant personal estate, out of which all his taxes could have been enforced;—that he was a southern man, who with his family was driven from his home in 1862, and his personal estate was lost, stolen or destroyed, and the petitioner seeing, that this was being done, would not make a levy on his property for his taxes and thus saved a little of it. He relies on the statute of limitations as a bar to the petitioner's claim, and claims, that the tax is not a preferred claim under the statute of distributions. He admits, that there will be ample funds in the

hands of the receiver to pay this claim, if it is a preferred claim, but insists, that it would be gross injustice to other more meritorious creditors, the estate being insufficient to pay all the debts. This answer was sworn to.

The cause in which this petition and answer were filed, had been pending ever since 1864; and the record was very voluminous, a very small part of which and that fragmentary appears in the record before us. But, as the counsel for the appellee have expressly declined to ask for a *certiorari*, and as on careful examination I think, we can with reasonable certainty decide the present controversy, which is apparently the only remaining controversy undecided in this cause, we have concluded to decide it without at our instance ordering a writ of *certiorari*. We feel justified in assuming, that there is no other subject of controversy undecided in the cause from what appears on the face of the record presented to us taken in connection with the proceedings had in this Court and in the conduct and actions of the appellee's counsel.

These proceedings appear from the record before us to have taken place prior to the filing of the petition in the cause. The creditors' bill filed in 1864 by a creditor of John Morris, who died in 1862, was brought in the Circuit Court of Cabell county to settle up his estate and to subject his real estate, which included fourteen different tracts of land in Cabell county, to the payment of his debts, his personal estate being insufficient for that purpose. The cause was referred to commissioner Thornburg. The decree ordering the reference is not, as it ought to have been, copied into the record before us; but we can see from a subsequent decree, that it ordered commissioner Thornburg to ascertain and report the real estate owned by John Morris at the time of his death, liable to be subjected to the payment of his debts, and also to ascertain and report all the debts of John Morris at the time of his death. Commissioner Thornburg ascertained and reported to the court what real estate said Morris owned at the time of his death, but he never fully ascertained nor reported the amount of his debts, having resigned his office before the completion of his report. On the 18th day of October, 1866, the cause was referred to commissioner Miller,

to perform the unfinished duties imposed upon the said Thornburg. On the 22d day of May, 1867, said Miller made his report, a small part of which appears in the record before us, apparently all that is necessary to decide the only remaining controversy in the cause, that is the controversy involved in the appeal now before us. In this he states, that he reported "the indebtedness of the estate of John Morris to each and every creditor. The following will show the amount due as far as ascertained."—Then comes a statement of the judgments against John Morris in his lifetime, a statement of the notes due from him, and a statement of the open accounts due from him and unpaid fee-bills, among which is listed as due: "Sheriff of Cabell county (1860) taxes $242.32." It will be observed, that on listing these debts the commissioner took it for granted, that the various items, which composed it, were correctly added up, whereas there was a mistake in the addition and they really amounted to $212.68. On the 25th day of May, 1867, this report was confirmed, the material part of the decree then entered being as follows:

" Commissioner Thomas Thornburg having heretofore filed his report showing the real estate owned by John Morris in his lifetime and now subject to the payment of his debts, and the same not having been excepted to, is approved and affirmed. And commissioner Joseph S. Miller having filed his report of the indebtedness of the estate of John Morris, deceased, and the same not having been excepted to is also approved and confirmed."

On September 24, 1867, it was among other things " adjudged, ordered and decreed that the reports of the indebtedness of the said John Morris, deceased, heretofore made by commissioner Joseph S. Miller be all re-committed to him and that he re-take, state and report an account showing the following particulars:

" 1st. The number, amount and date of the several judgments obtained against the said John Morris in his lifetime, with any and all credits thereon and the date of such credits.

"2d. Which of said judgments are for the purchase-money of lands, where the lands are situated and the quantity thereof.

" 3d. What debts, if any, not due by judgment obtained

in the lifetime of said Morris, are now due by his estate for the purchase-money of lands, where the lands are situated and the quantity thereof.

" 4th. What lands, if any, were owned by Morris in his lifetime, for which he had not the legal title, where such lands are situated and in whom the legal title is.

" 5th. What deeds of trust and mortgages, if any, were executed by the said John Morris in his lifetime in which his wife joined, and the amount thereof, and the lands upon which the same are.

" 6th. All other debts due by the estate of said John Morris, deceased, showing such as are due by judgment rendered since the death of said John Morris, and such as are due by notes and accounts, with the credits, if any, thereon,

" 7th. Any other matter or thing which he may deem pertinent and proper, or either party may require. "

On January 1, 1868, commissioner Miller made his report, in which he set out first a list of the debts due from John Morris by judgment against him in his lifetime, and the debts secured by deed of trust on real estate executed by him. The interest on all these is calculated to January 1, 1868, and they are called by the commissioner preferred claims. Their total amount, including said interest, was $27,290.65. Then follows a list of the judgments, which have been obtained against his administrator, which the commissioner calls junior judgments. These amounted with interest to January 1, 1868, to $5,375.10. Then follows a list of notes &c. and fee-bills, which amounted with like interest to $52,487.51; and speaking of the last class, he says : " which together with the junior judgment are to be paid *pro rata*, after all preferred claims have been fully satisfied. " In this last class the commissioner puts the tax-bill of the sheriff of Cabell county for 1860 and states it as $242.32, the same sum, which has been shown to be erroneous in consequence of a mistake in adding up the items, to which he adds $101.70, interest to January 1, 1868, making the whole claim as of that date $344.02. He then concludes his report as follows :

" Total indebtedness of estate, including interest to January 1st, 1868, and costs :

Preferred claims......................................... $27,290 65
Junior  judgments...........................  ..  ......... 5,375 10
Notes and other *pro rata* claims......................... 52,487 51

$85,153 26

Your commissioner has been careful in his calculations of interest and is satisfied that the above is a correct estimate of the indebtedness of the estate.   There are yet some outstanding claims against the estate, and your commissioner would recommend that a decree be made ordering them to be presented at some fixed time.   There are also credits claimed to be due upon one or more of the claims that are to be paid off *pro rata.* "

On July 6, 1868, a decree was entered, which, so far as it has any bearing on the matters in controversy, is as follows :

"This day Master Commissioner Joseph S. Miller presented his report of the amount of debts due by the estate of John Morris, deceased, as proved before him up to this time, with the order in which the same are payable, which report is ordered to be filed.     *     *     *     *     And it appearing to the Court by the said report of Commissioner Miller, that the amount of debts against the estate of said John Morris, deceased, due by judgments obtained against him in his lifetime, and by deeds of trust executed by him in his life time amount, with their principal, interest and costs up to this time, after deducting all credits, to the sum of $27,290.65, which debts being liens upon the real estate of the said John Morris, at the time of his death, are entitled to be first paid in full out of the proceeds of the sales thereof.

"And it further appearing from said report that the other debts against the said estate, which are entitled to be paid *pro rata*, with their interest and costs, approved before him up to this time, after deducting the credits proved, amount to about the sum of $57,862.61, making the whole indebtedness of the said estate as proved at this time $85,153.26.   And it further appearing from said report that there are other debts against said estate, still outstanding, and it appearing from the report of commissioners Ferguson and Kline, that the whole amount of sales of the lands of the said John Morris, deceased, is only $54,536.00, from which a small deduction will

have to be made for lands not owned by the said John Morris within his boundary, which sum is greatly below the amount of the indebtedness of the said estate already proved, and it appearing to the satisfaction of the court, that the sale of the said lands made by the said commissioners, is an advantageous one for the creditors of the said estate; and no exceptions being taken to the said report of said commissioners Ferguson and Kline, it is therefore adjudged, ordered and decreed, that the said report be and the same is in all things hereby approved and confirmed, and that so much of the report of commissioner Miller, as relates to the indebtedness of the said estate of John Morris, deceased, which constituted liens on his real estate at the time of his death, and which are therefore entitled to be first paid out of the proceeds of said sales, be and the same is in all things also hereby approved and confirmed. But it also appearing to the court from said report, that it is probable, that said estate is entitled to further credits upon some of the debts entitled to be paid *pro rata*, the court withholds the approval of that part of said report for the present. And it being desirable, that the total indebtedness of the said estate should be ascertained at the earliest day possible, in order that a final decree may be made herein, it is therefore further adjudged, ordered and decreed, that master commissioner Joseph S. Miller do take, state and report a supplemental account showing this. "

These proceedings were all had prior to the filing of the original petition of John S. Wilkinson on September 1, 1877. At the April term, 1879, this cause was heard together with some others; and an order of reference was made to commissioner Harvey. This decree ought to have been copied into the record but was not. It was a long decree requiring no less than thirteen different matters to be reported upon; but only the last need be stated, as it appears in the record before us. It is as follows:—" Any and all other matters and things, which any party to any of the suits hereby consolidated or interested in the questions involved therein may desire to be reported on, or which the commissioner may deem pertinent or proper to be reported. " A portion only of the report of commissioner Harvey under

this decree appears in the record. In it he states the preferred claims as reported by commissioner Miller as liens upon the real estate of which John Morris died seized. He adds the following:

In addition to the above which have been decreed preferred claims, there are two other claims that are claimed to be preferred; but have been reported upon by former commissioners as deferred.

"The parties have required me to report on them, &c.

| | | |
|---|---:|---:|
| The 1st was proven in the name of W. H. Morris and amounted to (January 1, 1868) ..... ..... | $253 25 | |
| Interest from Jan'y 1, '68, to Aug. 27, '79 ...... | 175 69 | |
| | | $428 94 |
| The 2d was proven in the name of the Sheriff of Cabell co., 1860, and belongs to J. S. Wilkinson, and was Jany. 1, '68 ......................... | $344 02 | |
| Interest from Jany, 1, '68, to Aug. 2, 79 ...... .. | 240 08 | |
| | | $684 10 |
| If these two claims are added the preferred debts will amount to ......... ..................... | $7,156 23 | |
| The deferred debts on Jany. 1, 1868, principal and interest amounted to ........................ | $58,845 36 | |
| The debt of W. H. Morris ....... .......$353 25 and Sheriff Cabell, 1860 ............ ... 344 02 | | |
| | $597 27 | |

Leaves ... ............. ....................... $58,248 09 "

He subsequently says in his report:

"Your commissioner has also been requested by John S. Wilkinson to report upon a priority of a claim of his for taxes, reported by commissioner Miller as a deferred claim, of $344.02, January 1, 1868. Your commissioner ascertained that John S. Wilkinson was deputy for W. E. Moore, sheriff of Cabell county, in 1860, and as such deputy, had these taxes against John Morris for collection, and that he never collected them, and when he settled with the sheriff he accounted for the taxes, and the debt now belongs to said Wilkinson and he is entitled to the same. These are the facts, your Honor can decide whether the same is a preferred or deferred claim."

This report was not excepted to by any one; and a decree was made on the 21st day of October, 1881, whereby—"so far as it ascertains the preferred liens, it is hereby approved

86

and confirmed. But the special commissioner of sale, M. S. Thornburg, shall retain out of the money in his hands the amount of principal and interest of the claim of John S. Wilkinson for taxes mentioned in said report, if the same should be hereafter allowed by this court." After the filing of Wilkinson's amended petition an order was made directing the said Thornburg to pay into the hands of the receiver of the court the sum of $800.00 to be held by him to await the decision by the court on Wilkinson's demand. On the 20th of December, 1883, the following decree was entered by the court:

"Upon the petition of John S. Wilkinson:

"This day this cause came on to be further heard upon the petition of John S. Wilkinson, the answer of C. K. Morris, administrator, and general replication thereto and the reports of Joseph S. Miller, master commissioner, filed herein and upon the report of Thomas H. Harvey, special commissioner, filed herein and the former orders and decrees and evidence and was argued by counsel, upon consideration of all which, it is adjudged, ordered and decreed that the taxes for the year 1860, levied upon the estate of John Morris, deceased, and paid by John S. Wilkinson as deputy sheriff, amounting to, at that date, the sum of $242.32, are for the use and benefit of said John S. Wilkinson, late deputy sheriff of Cabell county, and are a lien and charge upon the assets of said John Morris, deceased, real and personal, and may be well paid out of said assets, prior to the payment of any claims not subsisting liens against the said property of said John Morris in his lifetime.

"And it further appearing to the court, that there is due said John S. Wilkinson upon said claim the sum of $797.71, and it appearing that special commissioner M. S. Thornburg, was, by a former order entered at this term, directed to pay over to the receiver of this court the sum of $800.00, to be held pending the prosecution of this suit upon the claim of said Wilkinson. It is now adjudged, ordered and decreed that said receiver, H. J. Samuels, do, out of the moneys that may come into his hands as such receiver to the credit of this suit, pay to John S. Wilkinson, or to James H. Ferguson and John B. Laidley, or either of them, as attorneys for

said Wilkinson, the said sum of seven hundred and ninety-seven dollars and seventy-one cents, that being the amount according to the report of said Harvey, and interest to this date.

"And it is further adjudged, ordered and decreed that this decree be suspended for sixty days after the adjournment of this term of court to allow the administrator of John Morris, deceased, to obtain an appeal if he is so advised."

By a decree rendered on the 22d of August, 1882, the court ordered said M. S. Thornburg to pay the several creditors at large of John Morris, deceased, ten *per cent.* on their several claims; and a receipt appears under the decree, though no part of the record, showing that Wilkinson received of Thornburg $34.40 as the ten *per cent.* of his claim.

From the decree of December 20, 1883, John Morris's administrator obtained from this Court on the 8th of March, 1882, an appeal and *supersedeas.*

*Thomas H. Harvey* for appellant.

*J. S. Wilkinson, J. F. Brown, J. T. Waters, Jr., and J. H. Ferguson* for appellees.

GREEN, JUDGE:

The main inquiry presented by the record is: When a sheriff pays the taxes assessed against tax-payers, whether it be a county-levy or a State-tax on real and personal property, by advancing his own funds without the previous or subsequent knowledge or authority of the tax-payers, what, if any, claim does he thereby acquire against such tax-payers in their lifetime or their estates real or personal after their death? As the answer to this inquiry depends largely upon our statute-law, and as in the case before us these rights arose, if any exist, during the years 1861 and 1862 and are governed by the statute-law of Virginia at that time (Code of 1860), I shall confine this inquiry to the time, in which this code was in force in this State, and will leave unconsidered the question, whether these rights of the sheriff, if they ever existed, have been modified or changed in any respect by our present statute-law.

Taxes, whether State, county or municipal, are charges imposed directly or indirectly by the legislative power of a

State upon persons or property to raise money for public purposes. (*Becker* v. *Ballou*, 2 Wend. 223.) In its essential characteristics it is not a debt; it is not founded on contract, as is a debt, but operates *in invitum*. The difference between any tax proper and a debt is very marked. They differ entirely in their mode of collection and enforcement. (*Camden* v. *Allen*, 2 Dutch. 398; *Pierce* v. *Boston*, 3 Metc. 520.) In the absence of statutory provision taxes do not bear interest. (*Shaw* v. *Pickett*, 26 Vt. 482.) The assessment of a tax upon land does not create a debt against the owner; and therefore, when laid by a municipal corporation, it can not be garnished, attached or seized in execution at the suit of a creditor of the municipal corporation. (*Egerton* v. *Third Municipality*, 1 La. Ann. 435.) Nor is it a judgment or contract, which may be set off against the claim of a creditor of a city. (*Pierce* v. *Boston*, 3 Metc. 520.) Unless the statute expressly or by fair implication authorizes a suit to be brought to collect a tax, it can not be collected in that manner. (*Board* v. *Old Dominion Co.*, 18 W. Va. 441.) A statute abolishing imprisonment for debt does not affect imprisonment for the non-payment of taxes (5 Gray 530). It is true, there are some cases, in which it was held, that the imposition of a tax created a legal obligation to pay, on which the law raised an *assumpsit*, which might be sued on notwithstanding the law gives another specific remedy. (*Dungan* v. *Baltimore*, 1 Gill & J. 499; *Baltimore* v. *Howard*, 6 Har. & J. 383; *State* v. *Steamship Co.*, 13 La. Ann. 497; *Dunlap* v. *County*, 15 Ill. 9; *Ryan* v. *County*, 14 Ill. 83.) But, as was well said in *Board* v. *Old Dominion Co.*, 18 W. Va. 495, "these decisions are against both reason and the decided weight of authority." It is not true, that the imposition of a tax creates a legal obligation to pay. The above cases are overthrown expressly or necessarily in the following among other cases : *Camden* v. *Allen*, 3 Dutch. 399; *Shaw* v. *Pickett*, 26 Vt. 482; *McIrney* v. *Reed*, 23 Ia. 410; *Crape* v. *Stetson*, 3 Metc. 394; *Parker* v. *Tinsdale*, 50 Mo. 376; *Carondolet* v. *Picot*, 38 Mo. 125; *Alexander* v. *Holber*, 35 Mo. 334; *Cooper* v. *Savannah*, 4 Ga. 68; *Hine* v. *Leon*, 19 Wall. 339. I have found very few decisions directly on the right of a party,

who claims, that he is the assignee of a tax or, what is the same thing, entitled by subrogation to enforce its collection in any manner either by the exercise of the extraordinary modes of collection usually provided by statute, when the right to levy the tax is given, or by the institution of an ordinary suit, if no such extraordinary remedies be given by statute for its collection.

It does seem to me, that, if taxes, whether State, county or municipal, are not debts but are charges imposed upon the tax-payers *in invitum* by the exercise of the sovereign power of the State, then, as nothing but debts or contracts can be assigned either at law or in equity, and subrogation, because one has paid a debt to the original creditor, is in effect an equitable assignment of the debt by the creditor, it must follow, that taxes of no description can be assigned at law or in equity; and so of course one, who pays the taxes of another, whether or not he be the sheriff or collector, has no right to be subrogated to the rights and remedies of the State, county or municipality, as the case may be. The power to collect the tax is conferred by the sovereign State on a county or on a municipality, or in case of the State-tax the power is exercised by the State itself both of levying and collecting. This sovereign power to collect taxes in the mode prescribed by the State can not, if correct principles are followed, be exercised by any individual for his own benefit, any more than the other sovereign power of levying taxes can be exercised by him.

The case of *McIrney* v. *Reed*, 23 Ia. 410, decides, that taxes not being debts are not assignable, and that one, who has paid taxes for another, can not enforce their collection as entitled by subrogation to the rights and remedies of the municipal corporation, which levied the taxes. The opinion of the court was delivered by Judge Dillon, and, though in that particular case the tax was a municipal tax, yet much of his reasoning is as applicable to a State or county tax. The case was as follows: The city of Burlington was authorized by statute to levy a tax and the same statute declared it to be a lien on the real estate, on which it was assessed. The city provided by ordinance, that, if the tax was not paid on demand, the collector might by direction of

the council sell the land, on which the tax was assessed. This was done ; and the plaintiff bought the lot and paid the purchase-money. It was held, that this sale was a nullity, because the city had no right by an ordinance to enforce its lien by ordering a sale of the land ; but that it had a right to institute a suit like any one else in a court of equity for the purpose. The court also held, that, if this tax could be regarded as a debt, there was no question, that the plaintiff, the purchaser of the lot under the void sale, having paid the purchase-money to the city in satisfaction of the tax, would have had a right on the general principles of equity to be subrogated to the city's right to enforce this lien by a suit in equity ; but, as the tax was not in the nature of a debt and was not assignable, the plaintiff could not be subrogated to the city's rights ; and therefore his bill brought for this purpose was dismisssed on demurrer. Some of Judge Dillon's remarks in delivering the opinion of the court are so pertinent and striking that I will quote them. On pp. 414-5 he says:

"We have said, the city may collect by suit the special tax assessed upon the lot benefitted. Can the *plaintiff* as the alleged assignee of the city enforce the collection of the amount by a similar suit brought in his own name ? This is the difficult and somewhat close question in this case. If the 'special tax' or 'assessment' were an ordinary debt, and if the ordinary principles of law applicable to dealings between private individuals were applicable to the transaction set forth in the petition, it could not be denied, that the plaintiff by virtue of his purchase at the tax-sale and his payment of the money to the city, would become the equitable assignee of the city and subrogated to all its rights ; and this, though the sale was void. (*Anson* v. *Anson*, 20 Ia. 55, 60.) But the amount assessed on the defendant's lot is not an ordinary debt arising out of contract express or implied though partaking somewhat of the nature of a debt. There is an inherent or common-law power to enforce a debt proper, as for money lent or services performed; but there is no such power to enforce the collection of a tax or assessment; there must be a statute. The amount is assessed by virtue of the sovereign power of the State to levy taxes and

assessments, which power is by the charter delegated to the municipality. An amount thus assessed or imposed can not be said to be an ordinary debt * * * *. It would not do to hold, that a city could delegate or farm out either its taxing power or its power to enforce the collection of taxes. It would be a startling proposition to affirm, that a city could, for example, sell and assign its tax-list to any person and authorize him to exercise the high and delicate powers conferred upon the corporation. Why not? The legal answer is, that these powers are conferred upon the municipality to be *exercised by it*, not to be delegated to others. (*Thompson* v. *Schermerhorn*, 2 Seld. 92.)

"If there could not be an *express* contract for the sale of assessments with power to the assignee to collect in his own name, it would seem to be illogical to hold, that equity will infer or imply an assignment with a like power in the assignee to collect by suit in his own name. Equity will not imply an assignment between parties, who by law are incapable under any circumstances of making an express contract of a similar character. Again the power is delegated to the city to levy and collect the tax. As above observed the defendant is bound to pay by virtue of the power given by the law and by virtue of it alone. But this obliges him to pay to the city, upon which the power is conferred, not to some person, to whom the city has delegated the power. In bestowing the power upon the city, a power, the exercise of which is often burdensome and sometimes oppressive, the legislature must be taken to place confidence in the corporation and its officers. There are many reasons, why this power should not be communicable to individuals. Such a doctrine would prevent the city from giving lenity and exercising by itself and for itself and in view of the best interests of all the power which is given to it to collect its own taxes and assessments. We have carefully revolved this subject in its various bearings and think it best accordant with sound legal principles and with sound public policy to shut the door *in limine* upon a doctrine, which if pressed to its legitimate consequences, would lead to dangerous results, and which, if not thus adhered to, will be a useless anomaly in the law."

That was a case of municipal taxation, but the general reasoning, upon which the conclusion is reached, is equally applicable to State and county taxes. There may be some special reasons, why the power to collect municipal taxes should not be communicable to individuals. But on the other hand there are special reasons, why the power to collect State taxes should not be communicable to anybody; and the reasons, which forbid such a transfer are at least as strong as those which forbid the transfer of municipal taxes. I shall refer to some of these special reasons, which are peculiarly applicable to State taxes, after I have considered the statute-law on taxation to be found in the Code of Virginia of 1860, the law in force, when the transactions in this case took place, and which must control our decision.

By this Code, chap. 36, sec. 2, it was provided, that the sheriff should commence the collection of taxes yearly on the 1st day of July and might after such time make distress therefor; but section 4 of the same chapter provided, that no distress should be made for taxes or levies, when the sheriff or collector had had more than two years to collect the same, unless it be for taxes returned delinquent and sent out by the auditor for collection. And while these provisions applied to the collection of all sorts of State taxes as well as county levies, there was a special provision in the next chapter for the collection of taxes on real estate. There was an additional mode of enforcing the payment of taxes on real estate. Section 1 of chapter 37 provided:—"There shall be a lien on all real estate for the taxes assessed thereon and interest on such taxes from the 15th day of December in the year in which the same may be assessed until the payment thereof."

The same and succeeding sections provided the manner in which the lien should be enforced, that was, by requiring the sheriff to return under oath a list of the real estate delinquent for the non-payment of taxes. This list was to be returned as soon as practicable after October 1st in each year; and after the land was thus returned delinquent, never before, the lien was to be enforced by a public sale of the land or of a sufficient portion thereof to pay the taxes. This

chapter provides all the details of the manner of enforcing the lien.

It seems to be quite clear, that a sheriff, who had paid all the taxes for any year, which had been put into his hands for collection, if he had not collected the tax on any tract and had failed to return it delinquent, could not be subrogated to the lien of the State on said land for two very obvious reasons : first, because the State having settled with the sheriff and received from him all the taxes, to which it was entitled, the tax on this land was paid, and though it was paid by the sheriff, yet he could not be subrogated to the lien of the State for the reasons above given; and second, because the power to enforce the lien could not under this statute be exercised even by the State, unless the land had first been returned delinquent, which of course could not be done, if the sheriff had settled with the State for all the taxes due from his county. It would seem to be almost too clear to require any argument to show it, that it is contrary, not only to sound legal principles, but also to sound public policy to permit a sheriff to be subrogated in this respect to the rights of the State. Subrogation, which operates as an equitable assignment of a debt, can not in any case, unless it is so expressly provided by a constitutional statute, operate on taxes, which, as we have seen, are not debts and do not originate in a contract. It would not be more illogical to contend, that a demand for damages for assault and battery was a demand, to which a third person could be subrogated by paying the party assaulted the damages, which he claimed. Of course under no circumstances could a person be subrogated to such a demand; and so too no person can claim under any circumstances to be subrogated to a demand for taxes, which is no more a debt than is a claim for damages for assault and battery. While therefore a claim to be subrogated to this lien on land for taxes assessed on it is clearly contrary to sound law, it is equally contrary to sound public policy.

To sell a citizen's land for the non-payment of taxes on it in the way authorized by the law is the exercise of a sovereign power of the State, which can be justified only by the absolute necessity, that the State should receive promptly

87

the taxes, to which it is entitled in order to carry on the government and prevent its coming to an end. For this reason the legislature thought proper by the provisions of the Code of 1860 to permit the enforcement of the lien on land for taxes assessed on it by a sale of the land or of a portion of it at public auction for cash without any suit or other legal proceedings. It would indeed be a startling proposition to affirm, that under our law a sheriff or any one else for his own benefit could thus enforce a lien on land. Yet if the sheriff without any statute can be subrogated to the rights and remedies of the State for the collection of taxes, he can of course enforce the lien in this arbitrary manner. For if one is entitled to be subrogated to the rights of another, such subrogation acts as an equitable assignment of the debt and carries with it not only all the creditor's rights but also all his remedies.

The Circuit Court in this cause acted upon these views : for in determining what were the liens on John Morris's real estate by its decree of January 6, 1868, it excluded the taxes on his real estate, which had many years before been paid by the sheriff, but for which the sheriff claimed, he had a lien on said real estate, because he was subrogated to the rights of the State. This pretension the court disregarded by not including it among the liens on said real estate.

It is insisted by the counsel for appellee, that, though the sheriff could not be subrogated to the lien of the State on the real estate of the delinquent tax-payer, by paying the same in his settlement with the State, yet he was clearly under the Code of Virginia of 1860 subrogated to the State's right to collect said unpaid tax by distress. His argument is as follows :

"The sheriff, under the Code of 1860, withholding lands from the delinquent list, and advancing the tax to the State, did not stand in the attitude of a 'stranger' to the debt; as is clearly manifest from the provisions of § 4, of ch. 36 of that Code, which section authorized him to distrain for taxes for *two years* next after the right accrued ; whereas, he was required as soon 'as practicable after the first day of October' in the year succeeding the assessment of the tax, to make out his delinquent list, (§ 14). And by § 21 he was required

to pay into the Treasury '*three fourths* of the taxes on or before the 15th day of December,' in the year in which the same were assessed, and 'the remaining one fourth thereof, on or before the 15th day of March next thereafter.'

"Thus it will be seen that by the statute under which the appellee in this case acted, he was required to return his delinquent list and pay in full into the treasury, in *less than one year* from the maturity of the tax; whereas, he was empowered to continue his *collections* by levy and distraint for *two* full years from their maturity.

"It was undoubtedly the policy of the law to secure prompt payment into the Treasury, and at the same time reduce the delinquent list to a *minimum*. And to this end sheriffs were encouraged to advance the taxes to the State with the right in the name of the State to reimburse themselves, by subsequently collecting from the delinquent tax-payers, and to enforce for their own benefit all rights theretofore held by the State. These then included the lien for the taxes; until the act of 1881, which in terms excepted it. Code, ch. 31, § 28."

The counsel, in the above statement of what the law of 1860 was, makes one mistake and also omits a part of the law, which, when considered, will enable us to interpret that part which he does cite. For instance the counsel is wrong in asserting, that the sheriff was required by the Code of 1860, chap. 36, sec. 14, as soon as practicable after the 1st day of October in the year succeeding the assessment of the tax to make out his delinquent list. This section on the contrary requires the sheriff to make out his delinquent list as soon as practicable after the 1st day of October in the year, in which the assessment of taxes was made. The provisions of this chapter on this subject were, that the sheriff was to commence his collection of taxes on the 1st day of July or as soon thereafter, as he should receive a copy of the commissioners' books and might make distress therefor (sec. 2); but no distress should be made (sec. 4) for taxes or levies, when the sheriff had had more than two years to collect the same except for taxes returned delinquent and sent out by the auditor for collection. As soon as practicable after the 1st day of October in each year the sheriff was required to make out the delinquent lists for taxes on real

and personal property, which, on inquiry he might find, he could not collect. These lists were made out on oath and approved or corrected by the County Court (secs. 16, 17). The auditor was by the 14th section directed to credit the sheriff with the amount of these delinquent lists, if the said lists were presented before the 1st day of May next after the taxes were assessed, but not otherwise. So that the extreme time given to a sheriff to make his delinquent lists, have them approved and present them to the auditor was the 1st day of May in the year next succeeding the year, in which the taxes were assessed. Of the taxes assessed in any year three fourths were required to be paid into the treasury by December 15th of the year, in which they were assessed, and the remaining fourth by the 15th day of March next thereafter (chap. 37, sec. 21). Section 23 provided, that, if the sheriff failed to make these payments, the auditor should immediately publish a notice of such default in a newspaper at the capital of the State setting forth, that on a certain day within three months he would file in the clerk's office of the Circuit Court at the capital an accurate account of what the sheriff was chargeable with, and the clerk entered up at once a judgment against the sheriff for the amount so due and interest on it and also fifteen *per cent.* damages, unless the auditor directed a less amount of damages to be entered up. This judgment had in all respects the validity and effect of a judgment rendered by a court, and execution could issue upon it; but it was subject to, what may be regarded as an appeal, to be granted only for good cause, to the Circuit Court at the capital, which could not be granted after six months.

The mode of collecting State taxes under the Code of 1860, which for years before had been in force in Virginia and was for years after in force in West Virginia, appears from these provisions to have been ordinarily as follows: The sheriff commenced his collection on the first day of July in the year, in which the taxes were assessed, or as soon thereafter, as he received a copy of the commissioners' books. He was expected then within three months to ascertain, which of the taxes on the list were against insolvents and could not for that reason be collected, and also to make out

a delinquent list of lands, on which the taxes had not been paid. The delinquent lists were made on oath and were submitted to the County Courts, which met once a month, to approve or correct; and when so approved and corrected, a copy was sent to the auditor, who gave the sheriff credit for the amount. The sheriff was required to pay in three fourths of the taxes by December 15 of the year, in which they were assessed, and the remaining fourth on March 15. He was thus allowed five and a half months to collect three fourths of all the taxes, which could be collected, and three months longer to collect the remaining fourth. He was thus required to pay in the whole tax, not returned delinquent, by March 15 of the next year, that is, in eight and a half months, after he began to collect, which was generally on the 1st day of July. Of course he could return his delinquent lists before the last payment was required to be made, March 15, and if he did so, the auditor credited him therewith; but if he failed to return said lists by that time, the auditor charged him with the whole amount of the taxes, which went into his hands for collection. And the auditor without any other notice than a publication in a newspaper at the capital, that he would do so, had a right within three months to enter up judgment in the office of the clerk of the Circuit Court at the capital, on which execution could be issued. But even after such notice was given, that judgment would be taken, the sheriff in default was allowed six weeks from March 15 to return his delinquent lists; and, if he did so before the 1st of May, he was to be allowed credit by the amount thereof; but if he failed to do so, he could not afterwards return said lists, or, if he did, he would not be credited therewith. The law thus required the sheriff to pay in all the taxes in eight and a half months after he received the assessment for collection; and, if he failed to do so, the clerk might without any suit enter up judgment against him within less than a year and issue an execution thereon. As the sheriff was thus required to be prompt in paying over the taxes, which could be collected, he was as the agent of the State provided in return with the most efficient means of collecting said taxes, if the tax-payer had any personal property; for, if the taxes were not paid, whatever property the

tax-payer had, might at any time within two years be dis-trained and sold. But after two years they could never be collected by the State, if the sheriff had failed to return them delinquent. Not only was there no lien on land for taxes assessed thereon, if it had not been returned delin-quent; but there was no way, in which the State could col-lect any tax after two years, unless the taxpayer or his land had been returned delinquent.

As I understand the law at that time, the State could not issue a distress against a tax-payer after having received his taxes, that is, after the sheriff had made his settlement with the auditor without returning said tax-payer delinquent. It was a matter of no importance to the State, whether the taxes were paid by the sheriff by advancing them, or whether they were enforced by distress out of the tax-payer. The sheriff had been allowed ample time to collect them; and if he had failed to do so, it was his own fault, and the State demanded of him to settle the taxes, as though they had been collected by him, and could proceed summarily to en-force the demand. But until the State had so enforced pay-ment by him, he might of course go on collecting the unpaid taxes; for these taxes not having been paid to the State, the sheriff had a right to demand and by distress to enforce the payment thereof. But this right ceased, the moment the sheriff had paid all the taxes to the State, as no distress could be made for the taxes, after the State had received them, no matter from whom. But, even though, if the State failed to exercise its right of enforcing full payment of the taxes by the sheriff, it would still have the right by distress to make the taxes out of a delinquent tax-payer not so re-turned, it was expected to do so within a reasonable time; and, if it did not do so in two years, after the taxes became due, it never could collect them of the tax-payer in any manner.

The counsel for the defendant in error says: "It was un-doubtedly the policy of the law to secure prompt payment into the treasury and at the same time to reduce the delin-quent list to a *minimum*." This is certainly so; but the conclusion drawn from it by counsel seems to me to be erroneous. They think, that to effect this the sheriffs were

encouraged to advance the taxes to the State with the right in the name of the State to reimburse themselves by subsequently collecting from the delinquent tax-payers and to enforce for their own benefit all rights held by the State, including the lien on land for taxes assessed upon it.   The State by the law secured prompt payment into the treasury by requiring of the sheriffs to make such payment, after a sufficient time was allowed them to collect the collectible taxes, not, as the counsel seem to suppose, by encouraging the sheriffs to advance the taxes and subrogating them to the rights and stringent remedies, which the State had reserved to itself.   Such an impolitic subrogation of the sheriff to the rights of the State would have very little tendency to induce him to make advances to the State.   The State did not rely on the sheriff's advancing the taxes; that does not seem to be a very reliable way of collecting taxes.   What was relied upon was the power, after the sheriff had neglected within a reasonable time to collect the taxes, to compel him by a summary proceeding to pay the taxes into the treasury.   This was the way, in which the law of 1860 intended to secure prompt payment into the treasury.   So no doubt the statute-law intended to reduce the delinquent list to a *minimum* not by encouraging the sheriff to return as not delinquent tax-payers, who had no personal property, out of which the taxes could be made, a mode which, it seems to me, would have been very insufficient, but by compelling the sheriff to return his delinquent list under oath, swearing that he had not collected any part of it, and that it could not be collected.

I do not think therefore, that the statute-law of 1860 intended, that, when the sheriff advanced taxes to the State by a settlement in full with the auditor, he should be subrogated to the rights and remedies, which the State would have had, if it had not received the taxes.   Until it had received all taxes, to which it was entitled, not returned delinquent, though the time had passed for the sheriff to collect them, it had a right to make them out of the delinquent tax-payer by distress; but the 4th section of chapter 36 of the Code 1860 limited the exercise of this power to

two years. After that the State could only look to the sheriff and his securities. But in no case was the sheriff by the payment of all the taxes, which the law required him to pay, subrogated to the rights and remedies of the State. This was contrary to the principles of law underlying the right of subrogation, as well as to sound public policy, as we have seen; and it could not exist, unless it was expressly or by clear implication created and authorized by statute; and no such express or fairly implied authority was to be found in the Code of 1860.

Taxes are not debts, and therefore the equitable doctrine of subrogation or implied assignment can not without violating the fundamental principles of equity be applied to them; and its impolicy, so far as State-taxes are concerned, seems to me obvious. For, if subrogated to the rights and remedies of the State, the sheriff would be entitled to enforce any of these rights and to resort to any of these remedies after any length of time; for subrogation being an implied assignment, it transfers not only the rights but also all the remedies, which but for such assignment the assignor would have had; and as there is no statute of limitations, which bars any of the remedies of the State except as to the time in which taxes may be distrained for, of course the sheriff, when subrogated to the rights of the State, would be subject to no such bar. Now by the Code of 1860, chap. 130, sec. 25 and chap. 131, sec. 3 all the assets real and personal of a decedent are to be applied to the payment of demands against him in the following order:—first, debts due to the United States; second, taxes and liens assessed upon the decedent before his death; afterwards other debts and demands in a specified order. Therefore, if the sheriff was really upon settling in full with the auditor subrogated to the rights and remedies of the State for all the taxes, he had not collected, before he so settled in full, not only could he distrain for such taxes till the expiration of two years after the 1st of July, when he received copies of the commissioners' books, but if the person, whose taxes he had advanced, should die, he could at any time after such death bring a suit to subject such person's real and personal estate to the payment of such taxes no longer due to the State, but claimed to be

due by subrogation to the sheriff.    When paid to the State,
they cease to be taxes assessed on the decedent's estate.
The State can not collect them of the tax-payer; nor can
the sheriff as one subrogated to the rights of the State.    If
he could do so, he could do so after any length of time.    This
would obviously be very impolitic, if the Code of 1860 had
so provided; for it would become after a time almost im-
possible for a decedent's representatives to prove the pay-
ment of his taxes; and the burden would rest on them to
prove such payment, the simple production of the tax-
ticket made out by the sheriff establishing his claim, if not
disproved.

In this case the decree subjecting the real and personal
estate of the deceased tax-payer was rendered some twenty-
one years after his death and for a sum considerably more
than three times the original taxes assessed against him, the
increase being produced by the accumulated interest erro-
neously compounded twice.    It is true, the suit, in which
this decree was rendered, was instituted promptly after the
decedent's death; but if the suit had been delayed and not
instituted till a short time prior to the rendition of the de-
cree, if the sheriff really had the right of subrogation, al-
though the statute of limitations would have barred every
other debt or demand against the estate, this right to the
taxes by subrogation, could be enforced by the sheriff,
though the State had received them more than twenty years
before.    The Code of 1860 neither expressly nor by fair im-
plication gave the sheriff any such right.

There is no difficulty in applying these principles of law
to this case.    It is a general creditors' suit brought to sub-
ject the real and personal property of John Morris to the
payment of his debts.    He died in 1862, and this suit was
brought in 1864.    The amount of his debts was reported to
the court by commissioner Miller on July 1, 1868.    The
amount of debts being specific liens as judgments or deeds
of trust in Morris's lifetime was $27,290.65; and all his other
debts amounted to about $57,862.61, while his real estate did
not exceed in value $55,000.00.    The court confirmed this re-
port only so far as the specific liens were concerned, and as
to the other debts referred it back to a commissioner.    This

decree was rendered on the 6th day of July, 1868, and was correct. But though the report was not excepted to, yet, as this claim for the taxes was not included among the debts, which were approved and found to be just, and as with reference to all other debts the court did not confirm the commissioner's report but remanded the cause for further inquiry as to them, the petitioner can not claim, that, because his claim was thus reported as a debt to be paid *pro rata* with the general debts of the estate, the court could not afterwards properly decide, that he had no such subrogated right to claim these taxes. As he had no such right, the court ought to have rejected his petition, which he was allowed to file on the 1st day of September, 1877; for by it he simply claimed, he had a right to be subrogated to the lien of the State on the decedent's land, because as deputy sheriff he had paid these taxes to the State, a right, which he did not have, and as the statute-law of the State then was, could not in any case have.

For the same reason the court ought not to have permitted him to file his amended petition on the 18th of January, 1882, as in it he set out the facts more in detail and claimed the right to be subrogated to the lien of the State on the real estate of the decedent, and also to the right of the State to be paid first out of the assets of the decedent's estate both real and personal, his right to such subrogation being based solely on the fact, that he had settled in full with the auditor for all the taxes due to the State, including those of John Morris, which had not been returned delinquent. Nor could he be regarded as an open contract creditor of Morris's and entitled to *pro rata* distribution in the payment of his general debts; for he had, as we have seen, no debt and could not have, as he alleges in his amended petition facts, which negative the idea, that he paid these taxes for Morris at his request express or implied, or that said Morris ever in his lifetime ratified the payment as made for his use, even if such subsequent ratification would have created a debt, and I think it would not, as the ratification, after all the taxes were settled by the sheriff with the State, would, if there was no further responsibility on Morris, be without legal consideration. But it is not pretended, that there was any

subsequent promise or ratification by Morris. On the contrary it is expressly alleged in the petition, that it never was ratified by him in his lifetime. It is on those principles also obvious, that the decree appealed from is based on erroneous principles as shown on its face ; for it says : "It is adjudged, that the taxes of 1860 levied and assessed upon the estate of John Morris, deceased, and paid by John S. Wilkinson as deputy sheriff, amounting at that date to $292.32 are for the use and benefit of John S. Wilkinson * * * * and are liens and charges upon the assets of John Morris, deceased, real and personal, and may be well paid out of said estate prior to any claims not subsisting liens against the estate of said John Morris in his lifetime." This amounts to declaring, that this deputy sheriff was entitled to be subrogated to the right of the State to demand payment out of the real and personal estate of Morris before any but creditors, who had specific liens on his lands in his lifetime. Whereas he had no claim at all against his estate real or personal, none by subrogation and none by express or implied contract with said Morris.

I will suggest simply, that if the facts appearing in the record had occurred since 1881, under our State-law then passed the sheriff might have relief; but, I must say, my impression individually is, that he would not. The following addition was made to our law in 1881:—" If a sheriff or collector pay any taxes into the treasury, before he has collected the same, he shall nevertheless have the same remedy for the collection thereof by distress or otherwise, as if the same had not been paid to the State, except he shall not have a lien on the real estate, on which said taxes are assessed, therefor." We express no opinion as to the construction of this clause, as it is not involved in this cause.

It is proper to state, why we have taken jurisdiction in this cause without awarding a writ of *certiorari*. We have assumed, that there was no other undecided question of controversy in the cause, when this decree of December 20, 1883, was rendered. If there had been, there could have been no appeal properly awarded from the decree; for it was so decided by this Court in *Shirey* v. *Musgrave, supra,* p. 131, if the only ground, on

which the appeal is asked, is, that the decree appealed from adjudicated the principles of the cause. In *Lloyd* v. *Kyle*, 26 W. Va. 534, the history of legislation on the allowance of appeals from decrees adjudicating the principles of the cause instead of from final decrees is reviewed and is necessary to a full comprehension of the law on the subject. (*Buster* v. *Holland*, 27 W. Va. 510; *Hoy* v. *Hughes*, Id. 778).

In the case before us commissioner Harvey in his report made prior to October 21, 1881, at the request of one William H. Morris stated a claim, which by a prior report had been excluded from the class of claims, which were liens on the land of John Morris, and which part of said report had been confirmed, so far as it set out the debts, which were specific liens. (See decree of January 6, 1868.) This claim, the commissioner states, W. H. Morris asserts to be a preferred claim and asks the commissioner to report upon it; and the commissioner did report simply its amount, $253.25 with interest from January 1, 1868. Nothing else appears in the record with reference to this claim; and there is nothing to indicate upon what ground W. H. Morris claimed before the second commissioner Harvey and not before the first commissioner Miller, that this was a preferred claim. It might be suggested, that, if the entire record was before us, it might appear, that on the 20th of December, 1883, when the decree appealed from was rendered, W. H. Morris was still insisting, that his claim was a preferred debt or a lien, and that that question remained undecided by the court below, and therefore no appeal lay to said decree. Certainly if such a suggestion had been made by the appellee's counsel, and if he had asked for a writ of *certiorari* to bring up any portion of the record, which would show, that the claim of W. H. Morris was still an open question before the court below, this Court would have granted the writ; or, if there had been a motion by the appellee's counsel to dismiss this appeal as improvidently awarded, on the ground that the decree appealed from did not adjudicate the only controversy in the cause, this Court, even though a writ of *certiorari* had not been asked, would itself have ordered the writ to bring up other parts of the record, which had not been brought before us, in order that we

might determine the question.  Even if no motion to dismiss had been made, if the learned counsel for the appellee in their printed brief ·or in their oral arguments had suggested, that the appeal for that reason was improvidently awarded, this Court would of its own motion have ordered a writ of *certiorari* to issue to bring up the omitted parts of the record.  But no such suggestion was made; and from the conduct of the counsel for the appellee we feel sure, that they did not fail to make the suggestion, because they desired to have the appeal decided on its merits and not dismissed as prematurely granted.  This appears from the fact, that they made a motion to have the cause dismissed on technical grounds, which would not have prevented another application for an appeal, on the ground that the appellant had not had the record printed in six months, after the appeal was granted, inasmuch as what he had printed was but a skeleton of the record.  On an intimation from the Court, that such a motion could not prevail for such a reason, but that the Court would grant a writ of *certiorari*, if they asked it, to bring up any part of the record, which they deemed desirable in order to a proper decision on the appeal, they withdrew the motion and after an examination of the printed record before us stated to the Court, that they were sufficiently familiar with the record of the cause in the court below, to feel satisfied, that there was enough in the printed record before us to decide the cause justly, and therefore they did not desire a writ of *certiorari*. Had there been in the record below anything, which would show, that the claim of W. H. Morris, which he had at one time set up, was still maintained by him, when this decree was entered, the learned counsel for the appellee would not have declined to ask for a writ of *certiorari*.  It is moreover obvious, that the court below and the counsel for the appellee regarded this decree as appealable, from the first clause in said decree, which suspended it for sixty days to allow the appellant to take the appeal.  Under these circumstances we feel authorized to treat the decree of December 20, 1883, as appealable and to assume, that, if the omitted parts of the record were before us, they would show, that no other

matter of controversy in the cause was pending before the court, when the said decree was entered. To award a writ of *certiorari* of our own accord under the circumstances seemed to us improper, as it would apparently be useless and only further delay the decision of a cause, which has been pending in the courts for nearly twenty five years.

For the reasons, which I have assigned, the decree of December 20, 1883, must be set aside, reversed and annulled, and the appellant must recover of the appellee, John S. Wilkinson, his costs in this Court expended; and a decree must be entered, such as the court below should have entered, dismissing the original and amended petition of John S. Wilkinson and adjudging, that on the facts stated in them he has no demand against the estate of John Morris, and is not only not entitled to be paid before other claims, which were not subsisting liens against Morris's estate in his lifetime, but that he is not entitled to be paid at all out of said estate, having no claim against it because of the taxes of John Morris, which he paid or advanced to the State. And this cause must be remanded to the Circuit Court of Cabell county to be further proceeded with according to the principles governing courts of equity.

REVERSED.   REMANDED.